IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : : |
| Plaintiff, | : **Civil Action No.** |
| v. | : : : |
| MICHAEL H. JOHNSON, | : : |
| Defendant. | : : |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

### OVERVIEW

1. This case involves false statements by Defendant Michael H. Johnson, ("Johnson") that caused Carter's, Inc. ("Carter's or the "Company") (NYSE: CRI), an Atlanta-based manufacturer of children's clothing, to file materially false financial statements with the Commission.

2. During 2008 and 2009, Johnson was the Divisional Merchandise Manager for the Children's Division of Kohl's, a national retailer. In that

1

capacity, Johnson negotiated the amount of goods that Kohl's would purchase from Carter's and the amount of discounts that Kohl's would receive from Carter's in connection with those purchases.

3. These discounts—typically known in the clothing industry as "accommodations"—were intended to help Kohl's defray costs related to inventory clearance and sales promotions, and to allow Kohl's to achieve a desired profit margin.

4. Between 2004 and March 2009, the Carter's employee assigned to the Kohl's account, Joseph Elles, regularly granted Kohl's quarterly accommodations beyond the amount Elles was budgeted to give in exchange for Kohl's purchasing increased amounts of Carter's goods. At the same time, to conceal these additional accommodations from Carter's senior management, Elles obtained from Johnson and Kohl's an agreement to defer taking those accommodations, i.e., deducting them from invoice payments, until later quarters.

5. To further conceal his actions, Elles asked Johnson to sign representation letters in 2007 and 2008 assuring Carter's senior management that Kohl's was going to make specific amounts of purchases from Carter's and would expect only the margin support help for which Carter's had budgeted.

6. Johnson knew that these letters that he signed were false in that they misstated the amounts of accommodations that Carter's owed to Kohl's. Johnson also knew that the letters had been requested by Carter's senior management.

7. Carter's accounting personnel relied on these letters from Johnson when preparing the financial statements that Carter's filed with the Commission in 2007 and 2008. Those financial statements materially overstated Carter's net income.

## VIOLATIONS

8. Johnson has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Rule 13b2-1 of the Securities Exchange Act of 1934 ("Exchange Act") [17 C.F.R. § 240.13b2-1].

9. Additionally, Johnson has engaged in, and unless restrained and enjoined by the Court, will continue to engage in acts and practices that constitute the aiding and abetting of violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

3

## Jurisdiction and Venue

10. The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object and for civil penalties and other equitable relief.

11. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u (d), 78u(e), and 78aa].

12. Venue for this action is proper in the Northern District of Georgia because Carter's is headquartered in this district and the false representation letters were supplied to Carter's employees in this district and caused Carter's books and records to be inaccurate.

13. Defendant, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## The Defendant

14.     Michael H. Johnson, age 56, resides in Menomonee Falls, Wisconsin and is the Divisional Merchandise Manager for Kohl's Children's Division. Johnson negotiated the margin support payments from Carter's with Elles.

## Relevant Entities

15.     Carter's, Inc., is an Atlanta-based company that manufactures and markets in the U.S. apparel exclusively for babies and young children. The company sells clothing under the Carter's and OshKosh brand names as well as private label apparel through its own stores and other retailers. Since October 2003, Carter's common stock has been registered with the Commission under Section 12(b) of the Exchange Act and listed on the NYSE.

16.     Kohl's Corporation is a retailer based in Wisconsin. Kohl's operates over a thousand department stores in 49 states. At the time of the misconduct discussed herein, Kohl's was Carter's largest wholesale customer by volume of purchases.

## THE FRAUDULENT SCHEME

### A.     Background

17.     As a standard business practice, Carter's gives customers discounts off invoices to help customers defray costs related to inventory clearance and sales

promotions and to allow customers to achieve a desired profit margin on their subsequent resales of Carter's products.

18.     The granting of such accommodations has been a common arrangement in the clothing industry. Between 2004 and 2009, accommodations worked as follows.  Once an accommodation was agreed upon—typically at or near the end of a period—the customer then deducted the accommodation amount from its subsequent payments to Carter's.

19.     From an accounting standpoint, an accommodation is technically a contra-revenue account on the books of Carter's, but essentially it functioned as an expense that reduced the revenue otherwise realized by Carter's from the sale to which it related.

20.     From at least 2004 until March 2009, Carter's accommodations to Kohl's were negotiated on behalf of Carter's by Elles and Johnson on behalf of Kohl's.

**B.    Carter's Accounting for Accommodations**

21.     Under the matching principle of accounting, an expense should be recognized when incurred and in the same period as the revenue associated with that expense.

22. Unlike sales, which can typically be verified by purchase orders and shipping confirmations, accommodations were oftentimes negotiated amounts that were not finalized until just before or even after the last day of a fiscal period. This timing is a result of the fact that the appropriate amount of accommodations frequently cannot be known until the product is sold through to the end consumer.

23. At Carter's, the total accommodations extended to Kohl's for any given period was never finalized until negotiations were completed for that period during something called "market week," which typically occurred a couple of weeks after the last day of the relevant period but before Carter's closed its books for that period.

24. Although accommodations are taken by customers in the form of deductions against subsequent payments, Generally Accepted Accounting Principles require that the accommodation be recognized in the same period as the sales to which it related.

25. Carter's accounting department monitored and booked accommodations primarily by using information and documents obtained from Carter's sales department.

26. Specifically, when an accommodation was negotiated and granted to Kohl's, Elles' assistant filled out an Internal Authorization Form (or "IAF") which

set forth the details of each accommodation, including the customer, the amount, the date the form was processed, and the apparel category, budget year and selling season to which it related.

27.     This form was then forwarded to Carter's Manager of Strategic Planning ("Manager"), who was responsible for managing the company-wide budget for accommodations and tracking any changes therein. After being prepared by his assistant, Elles signed each IAF for Kohl's and caused them to be sent to Carter's accounting department.

28.     When a customer actually took an accommodation by deducting it from payment to Carter's, Carter's accounting personnel would check to see if they had a matching IAF on file. If so, they then cleared the residual charge from the customer's account receivable.

29.     In doing so, accounting also reviewed information from the customer accompanying the payment as it pertained to the details of the accommodation and checked to see whether it agreed with the IAF. If there were no matching IAFs on file, accounting personnel would contact the Manager or Elles' assistant to ask whether the accommodation was authorized and, if so, the accounting department would request the corresponding IAF. Whenever these individuals received such

an inquiry, they would go directly to Elles and relay Elles' response back to accounting.

30.     Since at least 2004 through his departure from Carter's in 2009, Elles secretly granted excess accommodations to Kohl's and affirmatively concealed those excess accommodations from Carter's accounting personnel. Specifically, Elles extended accommodations to Kohl's above and beyond what he was budgeted to give, and arranged for Kohl's to delay taking those excess discounts via deductions from its payments to Carter's for a sufficient amount of time such that each accommodation could be mischaracterized to Carter's accounting department as an expense of the period in which it was taken, rather than an expense of the period in which the sale to which it related was recognized by Carter's.

31.     Elles' actions produced a net understatement of Carter's accommodations and material overstatement of its net income in the following periods: Q1 2006 (19.1%); Q3 2006 (9.6%); Full FY 2006 (6.7%); Q1 2007 (6.5%); Q3 2007 (5.3%); Q4 2007 (6.7%); Full FY 2007 (5.0%); and Q3 2008 (8.0%).

### C. Johnson Signs False Representation Letters that Concealed the Fraud

32.   In early 2007, Kohl's claimed a large accommodations credit against a Carter's invoice, which exceeded what would normally be expected so early in the year. When questioned about the large request, Elles misrepresented to Carter's senior management that Kohl's was requesting that Carter's pre-pay some of Kohl's accommodations for the year based upon Kohl's plan to purchase a large amount of Carter's goods over the course of the year.

33.   In fact, the large amount of accommodations that Kohl's had sought related back to sales in 2006 and Elles concocted the prepaid story to conceal that fact.

34.   While Carter's senior management accepted Elles' explanation, they were concerned that Kohl's might not meet its purchase commitment and, consequently, directed Elles to obtain Johnson's representation as to the amount Kohl's intended to purchase for the year and the amount of accommodations it expected to receive for those purchases.

35.   At Elles' request, Johnson signed a representation letter in April 2007 which stated that Kohl's had requested $16.5 million of accommodations to be paid in certain installments throughout the remainder of 2007.

10

36. This letter understated the accommodations that were to be given to Kohl's during 2007 because it did not include the $4.4 million in additional outstanding accommodations already owing to Kohl's that Elles and Johnson had agreed upon for prior periods and which Kohl's had agreed to defer taking.

37. Moreover, the letter falsely stated that Kohl's had requested the accommodations to be paid according to a specified schedule when, in fact, Elles had asked Kohl's to defer taking certain accommodations.

38. In July 2008, Johnson signed another representation letter that underreported the accommodations that were to be given to Kohl's in 2008 and falsely claimed that Kohl's had requested the accommodations be paid according to a certain schedule. That letter listed $20.3 million in accommodations to be paid in 2008. The actual number, due to deferred accommodations was approximately $33.3 million.

39. Johnson signed the letters as a favor to Elles after Elles told him that the letters were required by Carter's senior management. Johnson knew or recklessly failed to note that the letters were being requested as a part of Carter's financial reporting process and would be incorporated into Carter's financial books and records.

11

### D.    Impact of the Fraud

40.    On October 27, 2009, following discovery of Elles' scheme, Carter's announced that it was delaying the issuance of its third quarter financial results in order to complete a review of its accounting for margin support provided to its wholesale customers. On the same day, the Company's stock price dropped 23.8% to a closing price of $21.66 from the previous day's closing price of $28.44.

41.    Shortly thereafter, on November 10, 2009, Carter's announced in a Form 8-K that management's review had "identified issues with respect to the timing of recognizing such margin support payments and the associated historical accounting treatment as a result of margin support commitments that were not disclosed to the Company's finance group."

42.    Carter's also announced that its Audit Committee, with the assistance of outside counsel, had begun a review of margin support payments more broadly and an investigation into undisclosed margin support commitments and related matters.

43.    In the same Form 8-K, the Company also announced that as a result of the review, its previously issued financial statements for the fiscal years 2004 through 2008 included in the Company's Forms 10-K, and for the fiscal quarters from September 29, 2007 through July 4, 2009 included in the Company's Forms 10-Q,

should no longer be relied upon and would be restated. On November 10, 2009, the Company's stock price dropped 9.1% to a closing price of $21.86 from the previous day's closing price of $24.04.

## COUNT I- INTERNAL CONTROLS

### Violations of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

44. Paragraphs 1 through 43 are hereby re-alleged and are incorporated herein by reference.

45. By his conduct, Johnson directly or indirectly falsified or caused to be falsified Carter's books, records and/or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

46. By reason of the foregoing, Johnson, directly and indirectly, has violated and, unless enjoined, will continue to violate Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## COUNT II- AIDING AND ABETTING
## INTERNAL CONTROLS

### Aiding and Abetting Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1]

47. Paragraphs 1 through 43 are hereby re-alleged and are incorporated herein by reference.

48. Elles violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] by knowingly circumventing Carter's system of internal controls, knowingly falsifying the books, records and/or accounts of Carter's, and knowingly causing to be falsified Carter's books, records and/or accounts.

49. Johnson knowingly or recklessly substantially assisted Elles' violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

50. By reason of the foregoing, Johnson aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Johnson committed the violations alleged herein.

## II.

A permanent injunction enjoining Johnson, his agents, servants, employees, and attorneys from violating, directly or indirectly, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1], and enjoining Johnson, his agents, servants, employees, and attorneys, pursuant to Section 20(e) of the Exchange Act, from aiding and abetting violations of Sections 13(b)(5) of the Exchange Act and Rule 13b2- thereunder.

## III.

An order pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties against Johnson.

## IV.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: October 24, 2012

        s/M. Graham Loomis
        Georgia Bar No. 457868
        Securities and Exchange Commission
        950 East Paces Ferry Road, Suite 900
        Atlanta, Georgia 30326
        loomism@sec.gov
        (404) 842-7622

        Pat Huddleston
        Georgia Bar No. 373984
        Securities and Exchange Commission
        950 East Paces Ferry Road, Suite 900
        Atlanta, Georgia 30326
        huddlestonp@sec.gov
        404-842-7616